IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

IN RE:   JIMMIE DARRELL MASSEY,                         3:04-bk-22385
         Debtor                                          CHAPTER 7


WARREN E. DUPWE,                                         PLAINTIFF
Chapter 7 Trustee

V.                     AP NO.: 3:06-ap-01024

JIMMIE DARRELL MASSEY                                    DEFENDANT


## MEMORANDUM OPINION

Now before the Court is the *Complaint To Revoke Discharge of the Debtor* (the "**Complaint**") filed by Warren E. Dupwe, in his capacity as Chapter 7 Trustee for the Debtor's estate (the "**Trustee**"), pursuant to 11 U.S.C. § 727(d). The Court held a trial in this adversary proceeding on January 10, 2007. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(J). The Court's findings of fact and conclusions of law are as follows.

## FACTS

On October 16, 2004 (the "**Petition Date**"), Jimmie Darrell Massey (the "**Debtor**") filed a voluntary petition under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended (the "**Bankruptcy Code**"). After reviewing the Debtor's schedules and conducting the meeting of creditors pursuant to § 341 of the Bankruptcy Code on November 12, 2004, the Trustee

EOD on 4/18/07  by dat

reported that there were no assets available for distribution to the Debtor's creditors. Accordingly, after the opportunity to object to the Debtor's discharge expired, this Court entered its *Discharge of Debtor* on January 12, 2005.

Sometime after entry of the Debtor's discharge, a third-party approached the Trustee with information that convinced the Trustee that the Debtor had not reported his assets accurately. This information prompted the Trustee to further investigate the Debtor, and ultimately led to the Trustee filing his Complaint.

**Facts regarding the Vehicles**

Sometime during the Spring of 2003, as the Debtor's primary secured creditor, Simmons First Bank of Jonesboro ("**Simmons Bank**"), which held separate liens on the Debtor's home and his two vehicles, prepared to foreclose, the Debtor decided to transfer his vehicles. The Debtor testified that rather than letting Simmons Bank repossess and sell his vehicles, he arranged a transfer to avoid being held liable for any potential deficiency. On May 7, 2003, the Debtor transferred a 1989 Chevrolet Corvette and a 1997 Chevrolet pickup truck (the "**Vehicles**") to Shirley Wrinkles ("**Wrinkles**") for $13,316.43. These funds were paid to Simmons Bank in satisfaction of its liens on the Vehicles. As it relates to the respective value of the Vehicles, the Court finds that the corvette was in excellent condition, since the Debtor regularly displayed the corvette at car shows. The Debtor testified that the corvette, despite its condition, was worth only $5,000; however he stated that he would not sell it for that little. When asked what he would sell the corvette for, the Debtor stated, "I'd probably be lucky if I

2

could get 10,000 out of it . . ." No one presented the Court with any evidence regarding the value of the pickup truck. At the time of the transfer, the Debtor and Wrinkles were dating each other; they were married just seven weeks later on June 28, 2003.

After the Debtor and Wrinkles married, the Debtor regularly utilized the Vehicles and continued to act as if the Vehicles belonged to him. The Debtor's testimony revealed that the Debtor regularly drove the 1997 Chevrolet pickup, and in Wrinkles testimony, she referred to the pickup truck as "Jim's truck". With regard to the corvette, Samuel Ross testified about his observations from a website that reported on local corvette car shows. Ross testified that the website showed pictures and newsletters which indicated that the Debtor and Wrinkles had received awards for the corvette.[1] The testimony at trial and the exhibits also showed that at some point prior to October 5, 2005, when Wrinkles filed her own chapter 7 petition, the Vehicles were transferred back to the Debtor.

**Facts regarding the Lot**

At trial, the Trustee entered into evidence a Warranty Deed which shows that on July 17, 2003, Wrinkles (now known as Shirley Massey) and the Debtor

---

[1] The Court looked at the website and accepted into evidence print-outs from the website which showed a picture of the corvette, and reported that a third-place prize was awarded to "Jimmy [sic] & Shirley Massey in their 1989 White coupe" for an October 16, 2004 car show (which coincidentally is the same date as the Debtor's bankruptcy filing). Another print-out reported that a second-place prize was awarded to the Debtor for a car show held March 19-20, 2005. Although the Debtor testified that the picture of the corvette may have been digitally altered by the photographer, the Debtor confirmed that the picture showed the correct vehicle and that the information regarding the prizes awarded for the corvette was correct.

3

purchased a lot located in Pleasant Valley Estates in Jonesboro, Arkansas (the "**Lot**"). At trial, Wrinkles testified that she purchased the Lot for $16,000, using funds that she received from her deceased husband's life insurance policy. However, in a January 2, 2004 deposition in an unrelated civil suit, Wrinkles stated under oath that she and the Debtor "probably paid about half apiece" for the Lot. When the Trustee questioned Wrinkles about this inconsistency at trial, the following exchange occurred:

> Q: (Trustee) Are you saying that he paid half or paid approximately half, or are you saying that he paid nothing?
>
> A: (Wrinkles) He paid nothing.
>
> Q: (Trustee) Okay. So you were testifying falsely under oath under this deposition, were you not?
>
> A: (Wrinkles) I guess.

Regardless of who supplied the funds to purchase the Lot, both Wrinkles and the Debtor held record title in the Lot. However, on November 24, 2003, the Debtor and Wrinkles transferred their interests in the Lot to Carolyn Bryant, a close friend of Wrinkles, for $1.00.

When the Debtor filed his bankruptcy petition, he did not list any interest in either the Vehicles or the Lot on his schedules, nor did he disclose the transfer of his interests in his statement of financial affairs. Likewise, when Wrinkles filed her bankruptcy petition, she did not list any interest in either the Vehicles or the Lot on her schedules, nor did she disclose the transfer of her interests in her

4

statement of financial affairs. The Trustee filed his Complaint on January 10, 2006 – just two days prior to the expiration of his right to request revocation of the Debtor's discharge pursuant to § 7272(e)(1) of the Bankruptcy Code.

## ANALYSIS

The Trustee seeks revocation of the Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1). Section 727(d)(1) of the Bankruptcy Code provides that, "On request of the trustee, a creditor or the United States trustee, and after notice and a hearing, the Court shall revoke a discharge granted under [section 727(a)] if . . . [i] such discharge was obtained through the fraud of the debtor, and [ii] the requesting party did not know of such fraud until after the granting of such discharge". In order for the Trustee to prevail in a revocation of discharge action, the Trustee must prove both of these elements by a preponderance of the evidence. *U.S. Trustee v. Lebahn (In re Lebahn)*, No. 03-ap-9062, 2004 WL 726915, *3 (Bankr.N.D.Iowa March 2, 2004) (citing *Floret, L.L.C. v. Sendecky (In re Sendecky)*, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002) ("The burden of proof is on the objecting party to prove each element of a section 727 Complaint by a preponderance of the evidence.")).

At trial, the Trustee stated that he found out about the Debtor's undisclosed assets and transactions from a third party "[s]ometime after the discharge was entered", and the Debtor did not dispute this. Therefore, the Court finds that the Trustee bore his burden on this element and focuses its attention on whether the Debtor obtained his discharge through actual fraud.

To revoke a discharge under §727(d)(1), a debtor must have committed a fraud in fact which would have barred discharge had the fraud been known at the time of the discharge. *Lawrence National Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991) (citing *Berman v. Burke (In re Burke)*, 99 B.R. 431, 433-34 (Bankr.W.D.Mo. 1989)). In the instant case, the Trustee represented to the Court that if he had known of the Debtor's undisclosed assets and transfers prior to discharge, he would have objected to the Debtor's discharge under § 727(a)(4)(A). Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." To prove a false oath under § 727(a)(4)(A), a plaintiff must show by a preponderance of the evidence that (1) the debtor made a statement under oath; (2) that statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the debtor's bankruptcy case. *Johnson v. Baldridge (In re Baldridge)*, 256 B.R. 284, 289 (Bankr.E.D.Ark 2000); *see also Jacoway v. Mathis (In re Mathis)*, 258 B.R. 726, 735 (Bankr.W.D.Ark 2000).

In this case, the Debtor signed his petition and submitted his schedules and statements as "true and correct to the best of [his] knowledge, information, and belief" under penalty of perjury. At the § 341 meeting of creditors, the Debtor again swore to the truthfulness of his schedules and statements. The Debtor's signature on his bankruptcy petition and his statements at the meeting of creditors each provide the basis for a claim of false oath. *Lebahn*, 2004 WL 726915 at *4

(citing *Jordan v. Bren (In re Bren)*, 303 B.R. 610, 613 (B.A.P. 8th Cir. 2004) ("It is clear that a debtor's signatures, under penalty of perjury, on a bankruptcy petition, schedules of assets and liabilities, and the statement of financial affairs are written declarations which have the force and effect of oaths."))

In this case, the Court finds that the Debtor's oaths regarding his schedules and statements were false because he failed to disclose any ownership interest in the Vehicles, and failed to disclose the transfer of the Lot. Although the Debtor insisted that he held no ownership interest in the Vehicles on the Petition Date, the Debtor's possession and continued use of the Vehicles is inconsistent with the purported transfer on May 7, 2003. Evidence of a debtor's continued possession and frequent use of property after its purported transfer places a burden upon the debtor to come forward with evidence explaining inconsistencies in his schedules. *See Ramsey v. Jones (In re Jones)*, 175 B.R. 994, 1000 (Bankr.E.D.Ark. 1994). Although the Court finds that the Debtor's testimony regarding the value of the corvette shows that the amount paid by Wrinkles for both Vehicles may have been close to the Vehicles' reasonable value, the nature of the transaction undermines the purported transfer, because the fact that the Debtor and Wrinkles were married just seven weeks after the purported transfer makes this transaction suspect at a minimum. The Court also finds it particularly noteworthy that the Debtor showed the corvette in a car show on the same date as his Petition Date, and displayed the car as Jimmie and Shirley Massey's corvette. Upon considering Wrinkles insider status and the evidence showing that the Debtor continued to use the Vehicles and

may have held himself out as an owner of the Vehicles (at least when displaying the corvette), this Court is left unpersuaded by the Debtor's explanation for not listing the Vehicles in his schedules.

With regard to the Debtor's failure to disclose the transfer of the Lot, the Debtor testified that he did not feel that he had any ownership interest in the Lot, and that he did not consider it to be his property. However, the Debtor knew that both he and Wrinkles held record title to the Lot, and both he and Wrinkles signed the Quitclaim Deed dated November 24, 2003(which was within one year of the Petition Date) transferring their interests in the Lot to Carolyn Bryant. Therefore, the Debtor knew that his statement that he had not transferred any property within the year preceding his bankruptcy was false.

At trial, the Debtor did not really dispute the fact that his statements were false, rather the bulk of his defense rested on whether he made the false statements with fraudulent intent. For purposes of § 727(a)(4), fraudulent intent exists if an individual knowingly makes a false representation to benefit himself. *Lebahn*, 2004 WL 726915 at *4. Since a debtor rarely admits to fraudulent intent, the plaintiff must generally rely on circumstantial evidence which suggests that the debtor harbored the necessary intent. *Mathis*, 258 B.R. at 733-34; *see also Lebahn*, 2004 WL 726915 at *5 (citing *Gray v. Gray (In re Gray)*, 295 B.R. 338, 344 (Bankr.W.D.Mo. 2003)). The testimony at trial showed that the Debtor and Wrinkles transferred the Lot in an attempt to frustrate potential creditors from a civil suit. However the evidence in this case went much further than that. After

8

reviewing the timing of the Debtor's and Wrinkles' transfers, and the assets reported on their respective schedules, the evidence shows that the Debtor and Wrinkles designed their transfers of the Lot and the Vehicles so that *neither* spouse would hold the assets at the time they filed their respective petitions. Therefore, this Court is convinced that both the Debtor and Wrinkles engaged in a course of conduct designed to prevent their respective trustees from discovering their assets. In fact, their scheme would have been successful if not for a third-party providing the Trustee with undisclosed information.

Having already determined (i) that the Debtor made statements under oath, (ii) that the statements were false, (iii) that the Debtor knew the statements were false, and (iv) that the Debtor made such statements with fraudulent intent, the only element left to consider is whether the Debtor's false statements related materially to his bankruptcy case. Any omission concerning the discovery or existence of assets and the disposition of such property is material. *See Palatine National Bank of Palatine, Illinois v. Olson (In re Olson)*, 916 F.2d 481, 484 (8th Cir. 1990) (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) ("The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.")). "[T]he failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the

9

judicial system as a whole." *Lebahn*, 2004 WL 726915 at *4. Therefore, the Court finds that the Debtor's failure to truthfully and accurately disclose information regarding the Vehicles and the Lot related materially to the Debtor's bankruptcy case. Accordingly, the Court finds that the Trustee satisfied his burden of proving, by a preponderance of the evidence, that the Debtor made a false oath.

## CONCLUSION

For the reasons stated herein, the Debtor's discharge under § 727(a) is hereby revoked. A judgment in accordance with this Memorandum Opinion shall be entered this date.

Dated: April 17, 2007

_____
HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE